## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

|                          |   |                  |
|--------------------------|---|------------------|
| **LAWRENCE MOSER ,**     | ) |                  |
|                          | ) |                  |
| **Plaintiff,**           | ) |                  |
|                          | ) |                  |
| **v.**                   | ) | **No. 3:07 CV 359** |
|                          | ) |                  |
| **TYSON FOODS, INC.,**   | ) |                  |
|                          | ) |                  |
| **Defendant.**           | ) |                  |

## OPINION and ORDER

Lawrence Moser ("Moser") alleges that his employer terminated him on account

of his age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et*

*seq*. ("ADEA"). The case comes before the court on defendant Tyson Foods, Inc.'s

("Tyson") motion for summary judgment. (DE # 35.)

## I.    BACKGROUND

The court briefly explains the parties' conflicting positions, as they see them. This

explanation is not intended to be a statement of undisputed facts, merely an overview

of the dispute. Moser was employed by Tyson for 31 years. Since 1996, he held the

position of "plant engineer" at Tyson's facility in Logansport, Indiana. In that position,

up through a written performance review in March, 2004, he was consistently evaluated

as a "strong" or "good" performer. In late 2004, Rick Retzlaff ("Retzlaff') became

Moser's supervisor. Retzlaff was significantly younger than Moser. Retzlaff began a

campaign to make Moser look bad, through a number of tactics including stripping

away his job responsibilities and assigning them to a younger employee, Mike Buckley

("Buckley'), and unfairly evaluating Moser's performance. In June, 2006, Retzlaff terminated Moser, and Buckley was promoted into Moser's position. Moser alleges that Tyson (acting through Retzlaff) fired him on account of his age.

According to Tyson, the plant in Logansport, Indiana had long been one of its worst—if not the worst—performing facilities, and in 2004 Tyson decided changes had to be made. Tyson fired the plant manager, Darrell Schmidt ("Schmidt"), who had given Moser the good written performance reviews, and gave the job to Retzlaff, at first as interim manager, but then permanently. In addition, Tyson also wanted to fire Moser, as it believed that he was also a cause of many of the problems in Logansport. Retzlaff defended him, however, and convinced Tyson that with proper coaching Moser could become an effective plant engineer. Nevertheless, after nearly two years of continued dissatisfaction with Moser's performance, Retzlaff terminated him.

## II.    LEGAL STANDARD

### A. Summary Judgment

The FEDERAL RULES OF CIVIL PROCEDURE mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). RULE 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

"[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed

issues of material fact and the movant must prevail as a matter of law. In other words,

the record must reveal that no reasonable jury could find for the non-moving party."

*Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations

and quotation marks omitted).

The court's role in deciding a summary judgment motion is not to evaluate the

truth of the matter, but instead to determine whether there is a genuine issue of triable

fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986); *Doe v. R.R. Donnelley &*

*Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for

summary judgment, the court must construe all facts in a light most favorable to the

non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v.*

*Devcom Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995); *Doe,* 42 F.3d at 443.

*B. ADEA Claim*

A plaintiff attempting to prove a violation of the ADEA may proceed using

either a direct or an indirect method of proof. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir.

2008). Under the direct method, a plaintiff must offer either direct or circumstantial

evidence pointing directly to unlawful discrimination expressed in the form of the

adverse job action complained of. *Id*. at 671-72; *Blise v. Antaramian*, 409 F.3d 861, 866 (7th

Cir. 2005). Direct evidence—essentially an admission by the decision-maker of the

prohibited animus, *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)—is

typically lacking. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004).

Instead, circumstantial evidence is normally used, falling into one of three categories, used alone or, more often, in conjunction to show a "convincing mosaic" of discrimination: 1) suspicious timing, ambiguous statements directed at people in the protected group, and other bits and pieces suggestive of a discriminatory animus; 2) systemic treatment (whether or not "rigorously" statistical) of similarly-situated employees, not in the protected class, better than that of the plaintiff; and/or 3) evidence that the plaintiff is qualified for, but denied, the position in question, which goes to a person not in the protected group, and the employer's reasons for that decision appear pretextual. *Brewer v. Bd. of Trustees of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007); *Sun v. Bd. of Trustees of the Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007); *Venturelli v. ARC Community Services, Inc.*, 350 F.3d 592, 601 (7th Cir. 2003). The third category is virtually the same as the evidence required to show pretext when a plaintiff relies on the indirect method. *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).[1]

Using the alternative indirect, or "burden-shifting," method, a plaintiff establishes a prima facie case of discrimination by evidence of: 1) membership in a protected class; 2) job performance meeting the employer's legitimate expectations;

---

[1] This raises an obvious question: is there any difference between the direct method and the indirect method? The answer seems to be, in terms of the ultimate question of proving discrimination should the case make it to a jury, "no." *See Anchor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997). Indeed, the burden-shifting method drops from the case once it is past the summary judgment stage. *Hamner v. St. Vincent Hosp. and Health Care Center, Inc.*, 224 F.3d 701, 705 n. 3 (7th Cir. 2000). The distinction is "useful more as a heuristic than as a rule of law." *Anchor*, 117 F.3d at 341.

3) an adverse employment action; and 4) in, as here, a termination case, that the employer sought someone else to perform the same work. *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007).[2] Once such a showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 364-65. If the employer does so, then the burden shifts back to the plaintiff to offer evidence suggesting that the proffered explanation is a pretext for discrimination. *Id.* at 365.

## III. DISCUSSION

In the discussion that follows, the court will rely on material facts which are not in dispute or, if disputed, on the version of the fact most favorable to Moser. *Knight v. Wiseman*, 590 F.3d 458, 462 (7th Cir. 2009). In addition, from the evidence viewed in this manner, the court draws all reasonable inferences in Moser's favor. *Id.*

---

[2] Tyson cites *Atanus*, 520 F.3d at 672-73, for the proposition that the fourth element is that the employee suffered worse treatment than similarly-situated employees who are outside of the protected class. Moser agreed with this assertion, leading to a great deal of wasted time by the parties arguing about whether Moser has shown that any similarly-situated employee has been treated better than him. (Evidence regarding similarly-situated employees might have relevance to other issues in this case, however, such as showing pretext, as will be discussed herein.) The court cannot blame the parties for making this mistake, since so many published cases do also, for example, *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006), which Tyson also cited. However, it has long been recognized that the treatment of similarly-situated employees is the fourth element in traditional reduction-in-force cases, *see, e.g., Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000), and that in hiring or firing cases it is that the position remained available or was filled by someone else. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (fourth element rejected applicant must show is that position remained open and employer continued to seek similar applicants); *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1212 (7th Cir. 1985) (fourth element terminated employee must show is that employer replaced him).

Tyson's argument for summary judgment proceeds down three avenues. First, Tyson argues that if Moser is using the direct method, he lacks sufficient evidence to create a triable issue of the ultimate fact of discrimination. Second, Tyson argues that, using the indirect method, Moser lacks sufficient evidence to create a triable issue on the second element, that is, that he was meeting Tyson's legitimate expectations.[3] Third, even if there is some evidence that Moser was meeting its legitimate expectations, Tyson argues that there is no evidence suggesting that its stated belief that he wasn't, given as the reason for his firing, is untrue, and therefore possibly a pretextual explanation to cover for unlawful discrimination.

A. Direct Method

Moser argues that he does in fact have sufficient evidence to proceed using the direct method. Much of his discussion of his direct case focuses on the third type of circumstantial evidence, and bleeds over into his discussion of proving his case using the indirect method. Indeed, in the portion of his memorandum in which he puts forth his indirect-method argument, he simply refers/incorporates the earlier part of his memorandum. Although this makes a rigid, step-by-step analysis difficult, the court cannot blame Moser for creating that difficulty, given that the third category of evidence under the direct method bears an "eerie similarity to the evidence required under the indirect method." *Volovsek v. Wisc. Dept. of Agric., Trade and Consumer*

---

[3] Tyson also argues that Moser hasn't met the fourth element, regarding better treatment of similarly-situated employees, but as noted above, this is not the correct fourth element.

*Protection*, 344 F.3d 680, 689 (7th Cir. 2003). Thus, it is good to keep in mind that no matter which method Moser is using to prove his case, he always bears the ultimate burden of showing that age was a determining factor in his discharge. *Coston v. Plitt Theaters, Inc.*, 831 F.2d 1321, 1325 (7th Cir. 1987), *vacated on other grounds*, 486 U.S. 1020 (1988).

Moser relies entirely on circumstantial evidence to proceed using the direct method. First, Moser points to comments made by Retzlaff which he believes show an age-based animus. In late 2004 or early 2005, Retzlaff, angry over an incident involving a USDA inspector complaining about a drip from a leaky roof that had been an ongoing problem, kicked a chair and said to Moser: "This old school shit has got to go." (DE # 38-6 at 20-21.)[4] On one or more occasions, Retzlaff stated that he was getting "young guys" or "horses in from corporate," or that corporate had hired a "stud." (DE # 41-2 at 14-15; DE # 41-4 at 3.) Retzlaff referred to Buckley, the younger employee who ended up replacing Moser, as a "horse." (DE # 41-8 at 15; DE # 41-4 at 3.)

This is the sum and substance of Retzlaff's supposed age-based comments, and it is difficult to see how, alone or in conjunction with the remaining evidence to be considered shortly, such comments suggest that Retzlaff terminated Moser on account

---

[4] For convenience, throughout this order instead of referring to documents by their titles, the court will use the "DE" number that identifies the docket entry and serves as the electronic link on the docket sheet, followed by the page number assigned by the electronic filing system to the relevant page of the electronic document image. The internal page number of the physical document used to create the electronic image will be used only when necessary for clarification.

of his age. The comment that the "old school shit" had to go does not even appear to be age-related. In his deposition, Retzlaff testified that he was referring to the way things had been done in the past, which was fixing problems with "Band-aids" instead of making a permanent correction. (DE # 41-8 at 14.) In fact, Moser himself understood the comment to mean that Retzlaff was dissatisfied with what he perceived to be Moser's practice of fixing problems as they occurred, rather than engaging in preventative maintenance to stop the problems from occurring in the first place. (DE # 38-3 at 22-23.)

It is also not clear that the terms "horse" or "stud" implicate age, but assuming it is reasonable to infer that they do, Moser has failed to place the comments on a time-line or a context that indicate they were related to his termination. These comments, and specifically the description of Buckley as a "horse," appear to have been made in the context of Retzlaff's belief that he was obtaining assistance for Moser and the plant, for example, expressing to Moser: "Larry, I really hired a horse. . . . He'll come in and he'll be real good for us." (DE # 41-4 at 3.) In a specific reference to Buckley, who was hired to be Moser's assistant, Retzlaff said to Moser: "Hey, you got a stud now. You got a horse. You really need to utilize him." (*Id*.) Thus, there is some irony in the fact that Moser suggests that one of the reasons for the perceived shortcomings in his performance is that he had to work without an assistant for so long, essentially doing two jobs until Buckley was hired. (DE # 40 at 7 n. 1; DE # 41-7 at 2 ¶ 1; DE # 41-3 at 14.)

Although Retzlaff's comments about "young guys" coming in from corporate do directly refer to age, they again are not put in any context by Moser. As Tyson points

out, even if these comments reveal a preference by Retzlaff to hire or recruit younger employees, such a mind set is not considered to be evidence of age-based animus against existing employees. *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1403-04 (7th Cir. 1996).

Looking at all of the supposed age-based comments made by Retzlaff, the bottom line is that Moser has not shown that any of them serve as circumstantial evidence of discrimination under the direct method. In order to do so, Moser must show that the comments were made by Retzlaff close in time, and in reference, to the challenged decision. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). He has not done so. In addition, the fact that Retzlaff had previously defended Moser when Retzlaff's superiors urged that he be fired makes it even less likely that Retzlaff's remarks are evidence of a discriminatory animus. *See Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 454-55 (7th Cir. 2009); *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 923-24 (7th Cir. 1996). Therefore, Retzlaff's comments are merely "stray remarks" from which no reasonable jury could infer a discriminatory animus.

The next thing that Moser points to as circumstantial evidence serving his direct method case is that Tyson hasn't shown that Buckley went through an adequate hiring process, or even had the necessary qualifications to assume Moser's position as plant engineer. In other words, Moser isn't really pointing to positive evidence of discrimination, he is pointing to an absence of evidence offered by Tyson, and in so doing, he forgets that he has the burden of proof. Proceeding under the direct method,

he has the burden of showing that that there is evidence of intentional discrimination. He hasn't offered any evidence that Buckley was not qualified for the position, and Tyson, under the direct method, has no burden to come forward with evidence showing that Buckley was qualified.[5]

Next, Moser argues that Tyson has failed to "sufficiently explain" why the assessment of his performance "drop[ped] like a stone under Retzlaff," which he characterizes as a "curious turn of events [that] raises a reasonable inference as to Retzlaff's suspect motivation." (DE # 40 at 7.) He argues that Tyson discounts his success at meeting the goals set by Retzlaff for his performance. (*Id*.) Besides the fact that, under the direct method, Tyson doesn't have to explain why Moser's performance rating suffered under Retzlaff, Tyson has nevertheless done so, and the court fails to see how the explanation is insufficient. It is undisputed that the good performance reviews of Moser at the Logansport were made by plant manager Schmidt. Tyson terminated Schmidt due to its dissatisfaction with his performance. Thus, the accuracy of Schmidt's reviews is somewhat suspect. Even were that not the case, it has been recognized that

_____

[5] This is, *ipso facto*, the difference between the direct method and the indirect method. The indirect method imposes a burden of production on the defendant after the plaintiff establishes a prima facie case. If the plaintiff is relying solely on the direct method, no burden of production ever shifts to the defendant. In the context of a motion for summary judgment, this is simply an application of the familiar principle that a defendant can obtain summary judgment by pointing to an absence of evidence supporting the plaintiff's case, *Celotex*, 477 U.S. at 323, and that in order to survive the motion, the plaintiff must point to sufficient evidence to create a material issue of fact on each of the elements as to which he bears the burden of proof at trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

earlier performance reviews are of limited use, the issue being performance at the time

of termination. *See Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113

(7th Cir. 1998) (earlier reviews, standing alone, do not demonstrate adequate

performance at time of termination, but may be considered on issue of pretext under

indirect method).

Moser also argues that Tyson "discounts" the progress which Retzlaff admitted

Moser was making towards meeting the goals Retzlaff had established to improve the

performance of the Logansport plant. (DE # 41-8 at 35.) Tyson responds that it admits,

consistent with Retzlaff's testimony on which Moser relies, that Moser had made "short

term progress" in areas such as avoiding downtime and reducing repair costs. (*Id*.)

However, Moser does not dispute that his performance continued to suffer in other key

areas. His last performance evaluation, on March 31, 2006, criticized him (and the

department he was responsible for) for a number of things, including struggling to

"support the team" and for not "dig[ging] further in [machinery] failure issues." (DE

# 38-5 at 39; 44.) The fact that Moser was making progress simply doesn't show that

Tyson was satisfied with his overall performance.

Next, Moser argues that it is suspicious that although Tyson asserts in its motion

that Logansport "was one of Tyson's worst performing pork plants," (DE #36 at 4), it

"conspicuously neglects to mention whether any of the Plant Engineers at the facilities

that ranked worse than Moser were terminated." (DE # 40 at 7). Again, under the direct

method, Tyson has no burden to produce any such evidence. In any event, however, in

its reply memorandum Tyson simply points out that the undisputed facts relied on in support of its motion do establish that Logansport was its worst plant from 2002 to 2004. In 2002 and in 2004, it ranked last in overall cost control measures (the plant engineer's responsibility), and next-to-last in that category in 2003. (DE # 37 at 3-4.) Thus, even assuming Tyson didn't terminate any other plant engineers, the inference Moser suggests should be drawn just is not there.

Finally, in a blended approach to the second and third categories of circumstantial evidence under the direct method, Moser argues that Tyson replaced him with a younger employee, Mike Buckley, and has treated Buckley better by not disciplining him or replacing him, even though he has performed worse as plant engineer than Moser. Indeed, Moser argues this, along with evidence that Tyson didn't follow its own procedures in terminating him and replacing him with Buckley, shows that the reason given for his termination—dissatisfaction with his performance—is a pretext for discrimination.

It is true, as Moser asserts, that if an employer treats similarly situated-employees who are outside the protected group better than it did the plaintiff, this can be direct evidence of discrimination and of pretext. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001). He then points to reams of evidence involving plant down-time, production costs, and "non-compliance records" ("NRs") issued by the United States Department of Agriculture ("USDA"), intended to demonstrate that his replacement, Buckley, is performing no better—and perhaps worse—than Moser did as

plant engineer, and yet Buckley has not been disciplined or terminated. Tyson responds by sifting through all of the same evidence, and pointing out how it can be used to show that Buckley in fact is doing a better job than did Moser. In addition, Tyson argues that Buckley, new to the position of head engineer, could be expected to have a learning curve (and he has shown steady improvement), and that many of the problems Buckley has dealt with causing down-time and impacting costs were created by the mess Moser left behind.

It might be that there is a question of fact as to whether Buckley is a worse performer, and this would prevent summary judgment if that were a material issue. But it simply is not. Even if Buckley is a worse performer than Moser, Retzlaff cannot have known that would be the case when he terminated Moser, and so neither Buckley's current performance nor Retzlaff/Tyson's response to it is relevant to Retzlaff's intent when he terminated Moser. Buckley's supposedly poor performance after Moser's termination "had no bearing on management's state of mind at the time the decision to terminate [plaintiff] was made, and thus that evidence is totally irrelevant to a determination of whether [plaintiff] was terminated in violation of the ADEA." *Cullen v. Olin Corp.*, 195 F.3d 317, 324 (7th Cir. 1999). Thus, Moser's showing with respect to Buckley's performance after Moser was fired isn't evidence of discrimination under the direct method.

Moser also argues that a piece of the puzzle of circumstantial evidence is that Tyson did not follow its own internal employment procedures with respect to his

termination, citing *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008), as authority recognizing that this can be evidence of pretext. He argues that "normal and understood Tyson policy [is] that a 30 and 60 day notice letter/warning is issued and an employee *can* be suspended prior to termination," and that he received neither written notice nor a suspension. (DE # 40 at 10.) (Emphasis added.)[6] The problem is, all that his evidence (consisting of his deposition testimony, and that of his replacement) shows is that an employee is typically given written notice(s) and a suspension prior to termination, not that Tyson policy requires those steps. That is not surprising, because as Tyson shows in its reply, its written disciplinary policy (DE # 44-2) does not mention 30 or 60-day notices, and does not require a pre-termination suspension. In a portion of Retzlaff's deposition that Moser did not cite, Retzlaff testified that while he could have taken such steps, neither 30 and 60-day letters, nor a suspension, were required by Tyson policy prior to terminating an employee. (DE # 44-3 at 3 (dep. pages 42-43).) As recognized in *Faas*, the authority on which Moser relies, the exercise of discretion by a manager is not the same as contravening a policy. *Id.*, 532 F.3d at 644. Thus, Retzlaff's exercise of discretion isn't evidence of pretext.

_____

[6] Moser also argues that Tyson didn't follow its policies in hiring (actually, promoting) Buckley to be his replacement. Besides the fact that this has little relevance on the issue of Retzlaff's state of mind when terminating Moser, Moser has not specified any policies that were not followed, as Tyson points out in its reply. Moreover, Tyson has offered undisputed evidence that shows its policies were followed, and that a different person than Buckley was initially chosen, but he withdrew himself from consideration. (DE # 44 at 13; DE# 38-6 at 32-33.)

This is a complete summary of the circumstantial evidence which Moser argues is enough to create a jury issue on the ultimate issue of Tyson's discriminatory animus using the direct method, and therefore survive summary judgment. For the reasons the court has explained, however, this evidence falls far short of what is necessary to show a "convincing mosaic" of discrimination for the jury to consider. Moser's attempt to rely on the direct method is not enough to stave off summary judgment.

B. Indirect Method

Tyson argues that it is entitled to summary judgment because Moser lacks sufficient evidence to create an issue of fact on two elements of his prima facie case, those being that he was meeting Tyson's legitimate expectations, and that he suffered worse treatment than similarly-situated employees not in his protected class. Second, Tyson argues that even if Moser has identified sufficient evidence supporting his prima facie case, he has no evidence suggesting that Tyson's stated reason for terminating him—that it was dissatisfied with his performance—is not true, and a pretext for discrimination.

As to whether Moser has evidence on the elements of his prima face case, the court need not discuss the similarly-situated employee requirement because, as explained *supra* at p. 5, n. 2, that is not the fourth element of Moser's required prima facie showing. All Moser has to show is that he was replaced, and that fact is not in dispute. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Tice*, 761 F.2d at 1212. Therefore, the

court need only address whether Moser has pointed to evidence which would allow a jury to find that he was meeting his employer's legitimate expectations.

In short, the court believes this is a case like *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177 (7th Cir. 1997), and its progeny, in which Tyson is entitled to summary judgment because Moser has failed to make that showing. For example, in *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002), the Court of Appeals found that the plaintiff had failed to meet that element of her prima facie case where there was undisputed evidence of the plaintiff's "deteriorating job performance" that was "overwhelming." The Court cited a record that included, for example, multiple written and oral warnings in the 18 months leading up to the plaintiff's termination, including nine critical written evaluations. *Id*. In addition, although the plaintiff focused her discrimination allegations on the actions of her immediate supervisor, the evidence showed that several other employees of the defendant had criticized her, "and that a consensus was reached by several Country Mutual employees that her failure to meet the company's legitimate employment expectations over an 18-month period warranted her being terminated." *Id*.

The evidence in the present case is strikingly similar. To give just a brief sample of evidence that is undisputed, at the time that plant manager Darrell Schmidt was fired, Jim Schmitz (Vice President of Pork Production Operations) and Don Wood (Divisional Engineer) discussed with Moser a number of their concerns with his performance, which they felt were largely the cause of the Logansport plant's problems.

(DE # 38-9 at 4, ¶ 22.) A few days prior to that meeting, Wood had sent Schmitz a memorandum outlining a number of his concerns about Moser (DE # 38-10 at 2, ¶ 6), but concluding "there are just too many issues to list. . . . The new manager and I need an engineer with integrity. Will Moser ever have it?" (*Id.* at 8.) On Retzlaff's second day as interim plant manager, he was told by Bob Barnum, the senior vice president of operations, that he should terminate Moser. (DE # 38-6 at 17.) Shortly thereafter, Schmitz also told Retzlaff he thought Moser should be terminated, as did Wood. (DE # 38-9 at 4, ¶ 23; (DE # 38-10 at 3, ¶ 15.) However, Retzlaff chose not to do so at that time, defending Moser and asking for time to work with him to coach him and improve his performance. (DE # 38-9 at 4, ¶ 24; (DE # 38-10 at 3, ¶ 16.) He continued to feel pressure thereafter from Schmitz and Wood to terminate Moser. (DE # 38-9 at 4, ¶ 19).

Although Retzlaff's first two evaluations of Moser over the next year gave him an overall rating of "good," he was rated a "developable performer" in several key areas, which meant that he was not meeting expectations. (DE # 38-5 at 10-12; 16-17; DE # 38-8 at 14, ¶¶ 91-92.) An ongoing problem at Logansport had been the number of NRs issued by the USDA, many of which concerned roof leaks and other structural and mechanical areas for which Moser was responsible, and in August 2005, Retzlaff reprimanded Moser for not getting to the root cause of the leaks. (DE # 38-2 at 16-20; DE # 38-6 at 20-21.) The increase in the number of NRs in 2005 and continuing in 2006 frustrated division engineer Wood. (DE # 38-10 at 4, ¶ 20.) Other department heads at the Logansport plant lost confidence in Moser, complaining to Wood that he failed to

resolve problems until they became "crises or worse," and expressing these concerns to Retzlaff on a weekly basis. (DE # 38-10 at 3, ¶ 11.)

By the time of Retzlaff's third evaluation of Moser at the end of September, 2005, his overall rating had dropped to "developable performer." (DE # 38-5 at 23.) On December 6, 2005, Retzlaff again gave Moser a written disciplinary warning for poor work performance. (DE # 38-5 at 6.) As a result of this warning, Moser set performance goals for his department. (DE # 38-3 at 34.) During the next six months there were some improvements, but problems continued: the USDA issued 25 NRs during this period, many of which were for the same ongoing problems. (DE # 38-8 at 6, ¶ 26.) Moser's evaluation for the period, ending March 31, 2006, still ranked him overall as a "developable performer." (DE # 38-5 at 39.) On May 22, 2006, Retzlaff gave Moser another written disciplinary warning because of significant downtime that had resulted from equipment failures related to improper maintenance. (DE # 38-5 at 8.) By this time Retzlaff believed that the USDA, divisional engineer Wood, and the other plant department heads had lost confidence in Moser's ability to solve the ongoing problems at the plant, as had he himself. (DE # 38-6 at 25-26.) Retzlaff then recommended that Moser be terminated, and that recommendation was approved effective June 6, 2006. (DE # 38-6 at 28-30.)

Moser disputes Tyson's opinion of him and belief that he was the cause of the problems, but fails to show that Tyson did not honestly hold that opinion and belief, even if it was wrongheaded (which the evidence does not even suggest). For example, a

specific incident Tyson blames on Moser occurred in June 2005, when the plant's basement flooded with sewage costing Tyson $200,000 in downtime, because—in Tyson's view—Moser had failed to properly maintain pumps and an emergency back-up pump. (DE # 37 at 10).[7] Moser argues that the basement flooded because other employees had flushed entrails and other debris down the drains, clogging them and causing water to rise, short-circuiting the pumps and knocking them out. (DE # 40-2 at 3.) But in Retzlaff's view, the flooding occurred because of Moser's poor preventative maintenance. First, one of the three electrical pumps was out of service because it had burned out due to improper maintenance. (DE # 38-8 at 7, ¶ 37.) The remaining two pumps could not keep up with the rising water. Moser's maintenance crew was unable to get an emergency gasoline-powered pump started, and Retzlaff later learned that they had not been peforming required monthy tests on the emergency pump, which would have revealed its inoperability. (*Id.* at ¶ 37, 38.) The rising water then submerged the two electrical pumps, which shorted out, because Moser's department had not waterproofed them. (*Id.* at ¶ 37.)

Another example is the leaking roof over portions of the plant, which was the cause of many of the USDA NRs. As Moser sees it, those problems continued after Buckley replaced him, but instead of holding Buckley accountable, Retzlaff "procured $2,000,000 to replace the roof." (DE # 40-2 at 12, ¶ 24.) But as Tyson sees it, expressed in

---

[7] It should be noted that it is undisputed that Wood and Schmitz wanted Moser terminated immediately for this event, but that Retzlaff continued to defend him. *Id.* (DE # 38-10at 4, ¶ 23.)

the affidavit of vice-president Schmitz, "Moser never put in a budget for a new roof over the carcass cooler." (DE # 38-8 at 5, ¶ 29.)

Thus, Moser's belief that he has shown that he was meeting Tyson's legitimate expectations runs up against the adage that employers are allowed to be unreasonable, and can "try to force a square peg into a round hole–and throw away the peg when it doesn't fit," *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989), as long as they aren't discriminating based on a forbidden factor.

The court recognizes that, despite the colorful quote from *Palucki*, circumstances can be imagined where an employer's expectation of an employee is so wrong—for example, demanding that a Chicago bicycle messenger make the trip from the Lincoln Park Zoo to the Dirksen building in less than five minutes—that the expectation doesn't appear to be one held in good faith, and so is not legitimate. This isn't such a case. All Moser has done is show that he disagrees with Tyson's management over the root cause of problems at the plant, not that management's belief in what was causing those problems is so absurd as to be illegitimate. "Plaintiffs lose if the company honestly believed in the non-discriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless." *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997) (stated in context of pretext analysis). Thus, Moser has failed to present a prima facie case that he was meeting Tyson's legitimate expectations.

The consequence of failing to identify evidence creating an issue on an element of the prima face case is supposed to be that "the defendant is not put to the burden of

stating the reason's for the employee's termination" and concomitantly, that the court

has no reason to move on to an analysis of pretext: "should the plaintiff strike out at the

first stage by failing to show that he was meeting his employer's bona fide expectations,

there is no occasion to go further." *Coco*, 128 F.3d at 1179, 1180. As a practical matter,

however, employers who move for summary judgment don't know whether the court

will agree with them that the plaintiff has failed to establish a prima facie case, so they

invariably also state the reason for the employee's termination, and argue there is no

evidence of pretext, just as Tyson has done in this case.

Moreover, when the reason for termination is that the employee wasn't meeting

expectations, the employer-movant's argument on that element of the prima facie case

ends up being indistinguishable from its argument on pretext. This leads courts to

merge analysis of that element of the prima facie case with pretext analysis, despite

*Coco*'s admonition that doing so runs "contrary to the thinking behind the formula," *Id*.

at 1179. While recognizing *Coco*, the Court of Appeals has acknowledged that this

occurs because "'the issue of satisfactory job performance, which lies at the heart of this

dispute, must be analyzed in detail at both stages of the *McDonnell Douglas* test, [and] it

is therefore simpler to run through that analysis only once.'" *Hague v. Thompson

Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006) (quoting *Rummery v. Ill. Bell Tel. Co.*,

250 F.3d 553, 556 (7th Cir. 2001).

In effect, the court has adopted that approach here, but at an earlier stage

through its consideration of Moser's arguments that he has circumstantial

evidence—pretext—allowing him to use the direct method. Moser's argument under the indirect method that Tyson's stated reason for terminating him is a pretext is that Tyson failed to follow its own procedures with respect to his termination, and that it treated Buckley more favorably. He simply refers the court to his earlier arguments on those issues in support of his direct method case. (DE # 40 at 19.) The court has set out its analysis on those issues above, and need only state here that Moser has not shown that an issue of fact on pretext exists which is sufficient to withstand Tyson's motion and require that issue of discrimination be submitted to a jury.

## IV.    CONCLUSION

The undisputed facts in this case show that Tyson is entitled to judgment as a matter of law. For the foregoing reasons, Tyson's motion for summary judgment (DE # 35) is **GRANTED**, and the clerk is directed to enter a final judgment in favor of defendant Tyson, stating that plaintiff Moser shall take nothing by way of his complaint.

**SO ORDERED.**

Date: March 29, 2010

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT